UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE | CASE NUMBER |
| **KNIPPERS, PEGGY** | **00-12491** |
| DEBTORS | CHAPTER 7 |
| **SAMERA L. ABIDE, TRUSTEE** | ADV. NUMBER |
| PLAINTIFF | **03-1003** |
| V. | |
| **PEGGY A. KNIPPERS and DOUGLAS T. KNIPPERS** | |
| DEFENDANTS | |

## **MEMORANDUM OPINION**

Trustee Samera Abide sued debtor Peggy Knippers and her former husband, Douglas Knippers, for a declaration of the community or separate status of a number of assets and obligations.[1] Because Peggy and Douglas Knippers lived under the Louisiana community property regime until their divorce in 2001 and never formally partitioned their community property before Peggy Knippers filed bankruptcy, this Court must settle the former spouses' community.

---

[1] The determinations are necessary to permit the trustee to determine how to distribute property of the estate to creditors in accordance with 11 U.S.C. §726. The trustee's original complaint contained allegations concerning the nature and disposition of the community and separate property of Peggy and Douglas Knippers. After the trial, the Court permitted the trustee to amend the complaint to conform the pleadings to evidence adduced at trial.

**PROCEDURAL BACKGROUND**

The current posture of this case has been complicated by its procedural history which, therefore, bears detailing here. The trustee's complaint, as amended, contains allegations regarding *only* the community or separate nature of the Knipperses' property and obligations, based on the information provided by the debtor's schedules, statements and testimony at the creditors meeting and on information provided by counsel for Douglas Knippers. However, Douglas Knippers raised reimbursement claims as offsets in his answer to the complaint. The debtor, on the other hand, raised no reimbursement claims in her answer.

Following the initial pretrial conference, the Court's scheduling order directed the parties to file, by June 16, 2003, a single, joint list identifying: (1) the assets and debts that were stipulated as community or separate and those assets and debts to which the parties were unable to stipulate; (2) each spouse's reimbursement claims and the amount and basis for these claims; and (3) other claims against each spouse. The parties did file a joint stipulation on June 16, 2003, but it contained no mention of either spouse's reimbursement claims, or any other claims the spouses had against each other. Peggy Knippers first articulated her reimbursement and other claims against Douglas Knippers in the pretrial order entered on February 11, 2004. Moreover, the issues of the debtor's standing and judicial estoppel were not raised even in the pretrial order. Thus, despite the Court's effort to clarify the issues and simplify the litigation for the parties, the case came on for trial with several important issues inadequately framed.

Peggy Knippers' standing to raise claims on her own behalf was resolved at trial, when the trustee reported that the Knippers bankruptcy may be a "surplus case," in which

2

the debtor receives a distribution from the estate after creditors' claims are satisfied. *See* 11 U.S.C. §726(a)(6). With the admission of the parties' stipulations as an exhibit,[2] aside from the judicial estoppel issue, only four disputes remained for trial:

> (1) whether funds paid by Exxon Corporation ("Exxon") in settlement of various contract and unfair trade practices claims were community property or the separate property of Douglas Knippers;
>
> (2) whether, pursuant to Louisiana Civil Code article 2368, Douglas Knippers owes Peggy Knippers' bankruptcy estate reimbursement for the uncompensated labor of *either spouse* at Knippers Exxon service station, which was Mr. Knippers' separate property;
>
> (3) whether Douglas Knippers owes the bankruptcy estate reimbursement for his use of flood insurance proceeds from Allstate Insurance Company for damage to the Pleasure Point camp (also known as the French Settlement property); and
>
> (4) whether Douglas Knippers owes the bankruptcy estate reimbursement for Mrs. Knippers' post-divorce mortgage payments to Advanta Mortgage, whose claim is secured by a second mortgage on the Denham Drive property that is Douglas Knippers' separate property.

## **FACTS**

Douglas and Peggy Knippers were married on November 19, 1994 and divorced on November 19, 2001. Their community property regime was terminated retroactive to August 28, 2000, the date on which the divorce petition was filed. La. Civ. Code art. 2356, comment (c). Mrs. Knippers filed a chapter 7 case on November 14, 2000. As of the date of her bankruptcy, the couple had not partitioned the property of the former community, so all the property of the former community became property of the Peggy Knippers bankruptcy estate. 11 U.S.C. §541(a)(2); *In re Hendrick*, 45 B.R. 976, 983-4 (Bankr. M.D. La. 1985).

The facts relevant to each of the disputed points are as follows.

---

[2] The stipulations are also entered into the record of this case as pleading 14.

(1) <u>Spouses' Uncompensated Labor at Knippers Exxon</u>

During the marriage, Mr. Knippers owned and operated two sole proprietorships: Gator Automotive, an automotive supply business; and Knippers Exxon, a service station.[3] Douglas Knippers owned both businesses before his marriage to the debtor, and no party disputes that the businesses were his separate property. Douglas Knippers opened his service station on January 1, 1983. The station closed to customers in November 1995, only about a year after Mr. and Mrs. Knippers married.

Peggy Knippers testified that she worked at the gas station from August 1992 until December 1995 and put in between 40 and 55 hours a week. Mrs. Knippers further testified that she ran the service station and supervised its nine employees. Douglas Knippers testified that in 1995 he worked at the station weekday evenings from 5:00 until 10:00 after he completed his day's work at Gator Automotive, and on weekends. Mrs. Knippers insisted that he was only at Knippers Exxon infrequently to deliver supplies, or to take cash out of the register.

On the issue of the compensation for their work at the station, the debtor testified that she received no salary or other compensation for her services. Douglas Knippers stated that he only received "small draws" from the business to pay living expenses. Mrs. Knippers denied taking any cash for herself from the station while she worked there, but Mr. Knippers said his wife did take cash draws as needed.

Judith Smith worked at Knippers Exxon as an assistant to Peggy Knippers for an unspecified period before the station closed in 1995. She testified that Mrs. Knippers at one point worked from the opening to the closing of the station, totally between eight and twelve hours a day. Ms. Smith also said that as far as she knew, Mrs. Knippers did not

---

[3] Neither business was operating at the time of trial.

4

take any money out of the business. Ms. Smith also stated that though she herself worked for the station five or six days a week, she did not see Douglas Knippers work evenings and weekends as he claimed, although he did occasionally pass through the station. However, Ms. Smith was impeached with evidence that undermined her testimony that she worked five to six days per week, the period during which she claimed to have witnessed Douglas Knippers' comings and goings.

Peggy Knippers also sought to bolster her case with the testimony of her niece, Melanee Hill. Ms. Hill worked at Knippers Exxon and Gator Automotive part time and on school holidays from 1993 until some time in 1995, while she lived with the Knippers family. She was a 15 year old high school student in 1995. Ms. Hill disputed Mr. Knippers' claim that he worked evenings and weekends at the gas station, but her motive to favor her aunt's position casts doubt on her credibility. Moreover, Hill was not a regular full time employee, and so had only limited opportunity to observe Douglas Knippers' hours at the station.

Douglas Knippers testified that he closed the service station in 1995 because it was not making any money. Although Peggy Knippers testified that the business made a small profit when she worked there, she conceded on cross examination that by 1995 it was not making enough money to justify staying in business. Thus, though Mrs. Knippers testified that the station had a 1995 net profit of $31,106.68 through its closing on November 30, 1995, documentary evidence[4] and Douglas Knippers' testimony supported a finding that the station was operating at a loss in 1995. The evidence also proved that the "net profit" actually resulted from the sale of gasoline and other inventory

---

[4] Exhibit Peggy Knippers 5.

that was not offset by the purchase of replacement inventory in light of the planned closing of the station.

(2) Settlement with Exxon

Had the profitability of Knippers Exxon been the sole issue in this adversary proceeding, the trustee and debtor may well have foregone litigating. However, the debtor and trustee saw potential for gain from the settlement of lawsuits relating to the service station.

Douglas Knippers and other independent Exxon service station owners filed federal and state class action lawsuits against Exxon in 1999.[5] The pleadings, which were introduced into evidence as Exhibit Peggy Knippers 7 (federal suit) and Exhibit Douglas Knippers 1 (state suit), reflect the class plaintiffs' claims that Exxon's terms with its dealers for customer credit card purchases made the dealers noncompetitive. Peggy Knippers testified that she gathered information relating to the claims in the suits, and also communicated and met with lawyers handling the lawsuits on behalf of the plaintiff station owners. Douglas Knippers settled both lawsuits in December 2001. Because the settlement was post-petition, the trustee received the settlement check from Exxon in the amount of $121,750.00, which she deposited for the benefit of the debtor's estate.[6] Mr. Knippers did not know how the settlement amount was calculated, or whether any amount was attributable to a particular year in which he operated the service station.

Neither Peggy Knippers nor the trustee offered any evidence concerning the calculation or allocation of the settlement payment.

---

[5] The state court lawsuit also named Retif Oil Company and Lard Oil Company, Inc. as defendants.

[6] Exhibit Douglas Knippers 2.

6

(3) <u>Insurance Claim Proceeds</u>

Among the assets stipulated to be community property is the Pleasure Point camp in French Settlement, Louisiana. The camp flooded in June 2001. Around August 16, 2001, after the divorce and after Mrs. Knippers' November 14, 2000 bankruptcy filing, Allstate Insurance sent Douglas Knippers two checks totaling $27,104.34 in payment of a flood loss claim.[7] One check was for $18,486.11, for flood damage to the dwelling. The second check, for $8,618.23, paid for personal property damage and loss. Although the checks were payable to both Douglas and Peggy Knippers, Mr. Knippers endorsed and negotiated them post-petition without Mrs. Knippers' endorsement, and apparently without the knowledge of the trustee.

Douglas Knippers claimed he used the insurance payments to repair some of the flood damage to the camp, although the payments were not sufficient to make all the necessary repairs. However, after telling the trustee that he had a few receipts for work done at the property, Mr. Knippers admitted to the debtor's attorney that he did not keep receipts for any of the work.

Peggy Knippers tried to establish the value of the camp had it not sustained flood damage through the testimony of Carl Gaspard, an appraiser. However, Mr. Gaspard was never qualified as an expert appraiser. More important, on cross examination Mr. Gaspard admitted that he lacked the information necessary to assign a value to the property had it not been damaged.

---

[7] Exhibit Peggy Knippers 19.

As for the other losses, an Allstate insurance adjuster's itemized estimate assigned a value to each piece of personal property lost or damaged when the camp flooded.[8] Peggy Knippers and Douglas Knippers identified specific items as the separate property of one spouse, or as community property. Peggy Knippers specifically identified as her separate property a hope chest, an antique wash basin and pitcher (apparently misdescribed on the estimate as a baker's rack), an oak chair, a kitchen cart, a microwave, medical books and Bibles. Douglas Knippers disputed these claims, but his testimony was unconvincing and not credible.

(4) <u>Mortgage Payments Made by Peggy Knippers</u>

Shortly after the divorce petition was filed, on September 5, 2000, Peggy Knippers sent payments totaling $1,580 to Advanta Mortgage (now Bank One). The payments were applied to debt secured by a second mortgage on the Knippers' former marital residence on Denham Drive in Denham Springs, Louisiana. The home is the separate property of Douglas Knippers, but the mortgage debt is a community obligation. (Stipulation 10).

## ANALYSIS

(1) <u>Judicial Estoppel</u>

Douglas Knippers and the trustee argue that Peggy Knippers is judicially estopped from pursuing her reimbursement and other claims against her former husband, because the claims were not listed in her schedules and statement of financial affairs.

Judicial estoppel is "a common law doctrine that prevents a party from assuming inconsistent positions in litigation." *In re Superior Crewboats, Inc.*, __ F.3d __, 2004 WL 1375712 at *2 (5th Cir. La.) (citation omitted). The Fifth Circuit recognizes three

---

[8] Exhibit Peggy Knippers 20.

requirements for invocation of judicial estoppel: "(1) the party is judicially estopped only if its position is clearly inconsistent with its previous one; (2) the court must have accepted the previous position; and (3) the non-disclosure must not have been inadvertent." *Id.*

In *Superior Crewboats*, the Fifth Circuit considered the ability of a debtor to pursue claims not disclosed in their bankruptcy case. One of the debtors in that case had allegedly been injured disembarking a ship owned by Superior. When the debtors filed for chapter 13 relief, they did not disclose any pending or potential lawsuits in their filings. While the case was pending, the debtors sued Superior in state court, but did not amend their bankruptcy schedules to disclose the suit. When the case was later converted to a chapter 7 liquidation, the debtors disclosed the suit to the trustee at the meeting of creditors, but incorrectly stated that the claim had prescribed under state law. The trustee then abandoned the lawsuit from the estate. Four months after receiving their chapter 7 discharge, the debtors responded to an admiralty limitation proceeding filed by Superior with a complaint to recover damages. When the trustee learned of this filing, he reopened the bankruptcy case and the debtors amended their schedules to disclose the lawsuit. Superior then moved to dismiss the debtors' complaint on the ground that it was barred by judicial estoppel.

In determining whether the personal injury claim was barred by judicial estoppel, the court in *Superior* stressed the importance of a debtor's continuing "express and affirmative duty to disclose all assets, *including contingent and unliquidated claims.*" *Id.*

at *3 (emphasis in original). The court concluded that the debtors[9] were judicially estopped from pursuing the personal injury claim against Superior because their positions concerning the claim in the bankruptcy case and the personal injury litigation were inconsistent, and the bankruptcy court had adopted their representations.

The reasoning of *Superior Crewboats* applies to the claims belatedly asserted by Peggy Knippers. Though Mrs. Knippers' schedules reflect a contingent interest in the Exxon litigation, the schedules and statement of financial affairs make no reference to any other claims. Specifically, they do not disclose the existence of a community property reimbursement claim, a claim for enhanced value of separate property, or any other claim against her former husband. Her conduct suggests that the debtor intended to have the trustee and Court accept her initial disclosures as complete and correct. Mrs. Knippers' prosecution of those claims now is completely inconsistent with her failure to disclose them in her original schedules, to the trustee at the meeting of creditors in her bankruptcy case, or indeed at any time until this adversary proceeding was virtually ready for trial.

For the first time in her post-trial brief, the debtor pleads that she inadvertently failed to disclose the claims involving her former husband and the marital community, and that she did not intend to mislead the trustee and the Court. No evidence supports this argument.

"'[T]he debtor's failure to satisfy its statutory disclosure duty is 'inadvertent' only when, in general, the debtor either lacks knowledge of the undisclosed claims *or* has no motive for their concealment.'" *Superior Crewboats, supra, at 3,* quoting *In re Coastal*

---

[9] The *Superior* court made no determination of judicial estoppel on the trustee's part, holding only that the trustee's request to substitute as plaintiff in the admiralty proceeding was mooted by the dismissal of the debtors' suit.

*Plains*, *Inc.*, 179 F.3d 199, 210 (5th Cir. 1999).  The Knipperses' divorce case had been under way for more than two months before Mrs. Knippers filed her bankruptcy petition.  The community property partition proceeding had started, but apparently had not progressed very far.  Peggy Knippers' post-trial brief complains that Douglas Knippers never responded to the debtor's demand for a listing of community property and debts, and that her family court attorney (who was not her counsel in this case), did not fully explain Mrs. Knippers's reimbursement rights to her until the trustee filed her complaint.  However, she offered absolutely no evidence at trial to support these contentions.

Moreover, Peggy Knippers did not amend her schedules or other filings in the related case to reflect any claims regarding the former community even *after* the trustee moved for approval of the Exxon litigation settlement and began to sell property.  Indeed, the debtor first objected to the trustee's efforts to liquidate assets to pay claims only after the trustee moved on February 11, 2003 for leave to sell the Pleasure Point camp, which took place *after* the trustee filed this complaint.  Surely by the date the trustee sued -- more than two years after Mrs. Knippers filed bankruptcy -- the debtor should have known the facts associated with her claims relating to the former community and her work for her former husband's business.  It is not plausible that Mrs. Knippers had no knowledge of the facts giving rise to her potential claims so that she could disclose those claims in a timely manner.  Moreover, during the course of *this* adversary proceeding, the debtor had the opportunity and the obligation, in both her answer to the trustee's complaint and in the stipulations prepared by order of the Court, to disclose her reimbursement claims.  Yet she failed to do so.

11

Despite this, under *Superior Crewboats* and *Coastal Plains* Mrs. Knippers' failure to timely disclose the potential claims could have been inadvertent, and preclude judicial estoppel, if the debtor had no motive to conceal the claims. However, the debtor offered no *evidence* to support a conclusion that she lacked a motive for concealing the claims. Moreover, because this apparently is a "surplus case," in which the trustee expects to return funds to the debtor after paying all allowed claims, the Court infers that the debtor chose not to disclose her reimbursement and other claims until she learned that she stood to benefit personally from the claims.

Because Peggy Knippers has not proven that she lacked knowledge of the claims against her husband, and because the debtor had a motive to conceal the claims, her failure to disclose them was not inadvertent within the meaning of that word as set out in *Coastal Plains* and reiterated in *Superior Crewboats.* Thus, Mrs. Knippers is now judicially estopped from asserting the claims she did not disclose in her schedules and statement of financial affairs. However, this conclusion does not preclude the trustee from discharging her statutory duty to pursue the claims on behalf of the bankruptcy estate. 11 U.S.C. §704.

(2) Claim for Portion of Exxon Settlement[10]

Louisiana Civil Code article 2341 states in relevant part that the separate property of a spouse comprises: "property acquired by a spouse prior to the establishment of a community property regime" and "damages or other indemnity awarded to a spouse in connection with the management of his separate property." The parties agree that Knippers Exxon was Douglas Knippers' separate property, since it was opened long

---

[10] As noted elsewhere in this opinion, the claim to an interest in the Exxon litigation is the only claim regarding the former community listed in the debtor's schedules.

before the parties married. Douglas Knippers contends that the Exxon litigation settlement proceeds are also his separate property because they arose from the management of the station.

Douglas Knippers owned and operated the station, and managed the property for the majority of the years it was open. Because the plaintiffs' claims in the Exxon litigation concerned Exxon's allegedly unfair and discriminatory business practices and how they adversely affected the operations and competitiveness of the independent Exxon stations, the Court infers that the settlement arose in connection with the management of Knippers Exxon, and therefore is separate property under Civil Code article 2341.

However, Peggy Knippers argues that the settlement was generated in part by her work at the station and in connection with the litigation. She reasons therefore that it should be characterized as community property, at least in part.

Louisiana Civil Code article 2338 contains a presumption that property acquired during the existence of the community through the effort, skill or industry of either spouse is community property. The claim for damages arose during the time in which Exxon allegedly engaged in unfair and discriminatory business practices. Its settlement after the community came into existence – indeed, after the community terminated – does not render it a community asset. Moreover, the only evidence of the work done by Peggy Knippers in connection with the Exxon litigation was the debtor's testimony that she gathered information for the lawsuit and met with the lawyers handling the case. Indeed, no evidence established whether any portion of the total settlement payment represented

the settlement of any particular aspect of the claim. The damages may well have been attributable to a period before the debtor married Douglas Knippers.

The record supports a finding that the litigation and subsequent settlement arose from the general operation and management of Knippers Exxon station. Thus, the Exxon settlement is the separate property of Douglas Knippers, and neither the bankruptcy estate nor Mrs. Knippers are entitled to any part of it.

> (3) Claim for Increase in Value of Separate Property Resulting from Uncompensated Labor of Spouse

Even though Peggy Knippers is estopped from asserting this claim, the trustee as the representative of the estate is not barred from seeking to recover the increase in the value of Knippers Exxon that resulted from Mrs. Knippers' work at the station.

The plaintiff's argument is that the *value* of Knippers Exxon was enhanced by the debtor's uncompensated work at the station doing "loss prevention" from November 1994 through November 1995.

Louisiana Civil Code article 2368 provides:

> If the property of a spouse has increased in value as a result of the uncompensated common labor or industry of the spouses, the other spouse is entitled to be reimbursed from the spouse whose property has increased in value one-half of the increase attributed to the common labor.

A spouse claiming reimbursement for an increase in value of the other spouse's separate property must prove that: "(1) the property is separate, (2) the property increased in value, and (3) the increase in value was based on the uncompensated or undercompensated labor of the other spouse." *Brehm v. Brehm*, 762 So.2d 1259, 1263 (La. App. 5th Cir. 2000) (citations omitted). The inquiry into whether the property

14

increased in value starts with the condition or value of the property at the time of the marriage. *Salley v. Salley*, 661 So.2d 437, 439 (La. 1995).

The service station was Douglas Knippers's separate property. Although the evidence indicates that there may have been uncompensated labor performed at the station by both Peggy and Douglas Knippers, absent proof that the station increased in value, this uncompensated labor is irrelevant.

The evidence confirmed that by 1995 the station was not profitable, and in fact was operating at a loss. Although Exhibit Peggy Knippers 5 purported to show an annual "net profit" through November 1995 of $31,106.68, this "profit" resulted from the sale of gasoline and other inventory that was not offset by purchases of replacement inventory. No party offered reliable, credible evidence of the station's value as of the start of the community property regime, and the trustee's conjecture concerning the value of the business at that point is purely speculative. Accordingly the trustee's claim for a share of the enhanced value of Knippers Exxon under article 2368 will be denied.

(4) <u>Claim to Insurance Proceeds</u>

Well after Peggy Knippers filed for bankruptcy, Douglas Knippers received and wrongfully negotiated two checks from Allstate Insurance. The August 18, 2001 checks were payments for damage to the Pleasure Point camp and its contents in a June 2001 flood. The parties stipulated that the camp is community property. (Stipulation 5).

Douglas Knippers insisted that he used the insurance money to repair the flood damage, but no independent proof corroborated his testimony and the Court concludes that his testimony is not credible.[11] On the other hand, Peggy Knippers did not prove that

---

[11] Douglas Knippers admitted at trial that he did not arrange to repair some of the flood damage, and that he used some of the insurance proceeds to pay for work that was not flood-related, including installation of

15

Mr. Knippers' lack of attention to the damage reduced the value of a community asset because her expert could not testify to the value of the camp had it not been damaged in the flood.

The $18,486.11 check from Allstate was paid as a result of damage to community property and therefore is community property. *See* La. Civ. Code art. 2338 (community property includes "damages awarded for loss or injury to a thing belonging to the community . . . .")  Because Mr. Knippers failed to prove that he used the money to repair the community asset, he must reimburse the bankruptcy estate $9,243.06 for Mrs. Knippers' one-half interest in the insurance payment for the damage to the dwelling. *See* La. Civ. Code art. 2366.[12]

The insurance claim payment on account of loss to the personal property must be dealt with differently because not all the lost or damaged contents of the camp were community property.  Several items were the separate property of either Peggy or Douglas Knippers.  Specifically, the testimony concerning the baker's rack, antique table, oak chair, kitchen cart and microwave is conflicting.  However, the Court finds Mrs. Knippers' testimony more credible because it was more specific.  Therefore, the $8,618.23 insurance proceeds from the second check negotiated by Douglas Knippers will be allocated as follows:

$1,851.67 to Douglas Knippers for his separate property located at the camp

$1,650.00 to the bankruptcy estate for Peggy Knippers' separate property located at the camp

---

central air conditioning and heating.  He also acknowledged using some of the insurance payment to buy himself a computer.

[12] Article 2366 states that: "[i]f community property has been used for the . . . benefit of the separate property of a spouse, the other spouse is entitled upon termination of the community to one-half of the amount or value that the community property had at the time it was used."

> $2,558.28 to the bankruptcy estate for Peggy Knippers' one-half interest in the community property located at the camp

Because Douglas Knippers retained the entire check for the personal property loss, he is liable to the estate for $4,208.28, representing reimbursement for half of the community property and Peggy Knippers' separate property.

(5) <u>Reimbursement for Mortgage Payments</u>

The trustee argues that Douglas Knippers owes the estate reimbursement for one-half of the amount of the debtor's $1,580 in mortgage payments in September 2000.

Louisiana Civil Code article 2365 provides that:

> [i]f separate property of a spouse has been used to satisfy a community obligation, that spouse, upon termination of the community property regime, is entitled to reimbursement for one-half of the amount or value that the property had at the time it was used.

Although this Civil Code article seems to command reimbursement, the Louisiana Third Circuit Court of Appeals in *Sheridon v. Sheridon*, 867 So.2d 38 (La. App. 3d Cir. 2004) recently held that the crucial phrase of the statute is "upon termination of the community." The court noted that because the phrase "upon partition" does not appear in the statute, the reimbursement contemplated by article 2365 "pertains only to debts paid *during* the marriage, and not those paid after divorce." *Id*. at 44 (emphasis added).

Because Peggy Knippers made the mortgage payments *after* the community terminated, article 2365 is inapplicable and the estate is not entitled to reimbursement from Mr. Knippers for those payments.

## **CONCLUSION**

Peggy Knippers is judicially estopped from asserting her reimbursement claims and other claims against Douglas Knippers for failure to disclose those claims in her

17

schedules and statement of financial affairs. Nevertheless, the trustee is not judicially estopped from doing so and is authorized to pursue those claims on behalf of the bankruptcy estate.

The Exxon settlement is the separate property of Douglas Knippers.

There was insufficient proof that the bankruptcy estate is entitled to reimbursement for uncompensated labor of either the debtor or Douglas Knippers in connection with Knippers Exxon.

Next, the estate is not entitled to any reimbursement for the $1,580 in mortgage payments made to Advanta Mortgage in Sepember 2000.

Finally, the estate is entitled to reimbursement from Douglas Knippers in the amount of $13,451.34, representing one-half of the Allstate Insurance payments for flood damage to the community property and all of Peggy Knippers' separate property at the Pleasure Point camp.

Baton Rouge, Louisiana, July 29, 2004.

**s/ Douglas D. Dodd**
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE